**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARIA JOSE PIZARRO<br><br>　　　　　　　　　Plaintiff, Counterclaim<br>　　　　　　　　　Defendant,<br><br>　　　-against-<br><br>EUROS EL TINA RESTAURANT LOUNGE and BILLIARDS CORP., SANTIAGO QUEZADA, And SANTIAGO QUEZADA, Jr.,<br><br>　　　　　　　　　Defendants, Counterclaim<br>　　　　　　　　　Plaintiffs, Crossclaim<br>　　　　　　　　　Plaintiff, Third Party Plaintiffs<br><br>　　　-and-<br><br>JOSE E. CASTRO, ELADIO CASTRO PRODUCTIONS, INC., EMITON FERNANDEZ a.k.a. EMILIO FERNANDEZ, NARCISO GOMEZ, ZOILIMAR MEJIA a.k.a ZULIMAR MEJIA, and TOMAS ANDRES PIZARRO ZEPEDA<br><br>　　　　　　　　　Third Party Defendants,<br>　　　　　　　　　Crossclaim Defendants | No. 1:20-cv-05783-AKH |

**DEFENDANTS' FIRST AMENDED ANSWER TO PLAINTIFFS COMPLAINT, COUNTERCLAIM AGAINST PLAINTIFF, MARIA PIZARRO, THIRD-PARTY COMPLAINT, AND CROSS CLAIMS AGAINST THIRD PARTY DEFENDANTS, JOSE E. CASTRO, ELADIO CASTRO PRODUCTIONS, INC., EMITON FERNANDEZ a.k.a EMILIO FERNANDEZ, NARCISO GOMEZ, ZOILIMAR MEJIA a.k.a ZULIMAR MEJIA, and TOMAS ANDRES PIZARRO ZEPEDA.**

　　　　Defendants, Euros El Tina Restaurant Lounge and Billiards Corp. ("Euros"), Santiago Quezada ("Quezada"), and Santiago Quezada, Jr. ("Junior") (hereinafter and collectively "Defendants"), by their attorneys, the Law Offices of Martin E. Restituyo P.C., as and for their First Amended Answer with Counter Claims and Cross Claims to the complaint of Maria Jose Pizarro (hereinafter "Plaintiff") filed on July 24, 2020 (the "Complaint"), set forth the following:

**AS AND FOR AN ANSWER TO THE SECTION TITLED "NATURE OF THE ACTION"**

　　　　1.　　　　Admit the allegations set forth in Paragraph 1 of the Complaint to the extent that they state that Plaintiff was the General Manager at Euros for approximately 10 years but deny the remaining allegations therein.

## AS AND FOR AN ANSWER TO THE SECTION TITLED "JURISDICTION AND VENUE"

4.      Admit the allegations set forth in Paragraph 4 of the complaint to the extent they indicate the statutes under which Plaintiff is suing, but deny the applicability of those statutes to the instant action.

5.      Lack knowledge and information sufficient to form a belief as to the veracity of the allegations contained in Paragraph 5 of the Complaint.

6.      Lack knowledge and information sufficient to form a belief as to the veracity of the allegations contained in Paragraph 6 of the Complaint.

## AS AND FOR AN ANSWER TO THE SECTION TITLED "JURY TRIAL DEMANDED"

7.      Admit the allegations set forth in Paragraph 7 of the Cmplaint and respectfully refer all questions of law to the Court.

## AS AND FOR AN ANSWER TO THE SECTION TITLED "PARTIES"

8.      Admit the allegations set forth in Paragraph 8 of the Complaint to the extent that they state that Plaintiff was the General Manager at Euros for approximately 10 years, but lack knowledge and information sufficient to form a belief as to the veracity of the remaining allegations therein.

9.      Lack knowledge and information sufficient to form a belief as to the veracity of the allegations contained in Paragraph 9 of the Complaint.

10.     Lack knowledge and information sufficient to form a belief as to the veracity of the allegations contained in Paragraph 10 of the Complaint and respectfully refer all questions of law to the Court.

11.     Admit the allegations set forth in Paragraph 11 of the Complaint.

12.      Admit the allegations set forth in Paragraph 12 of the Complaint to the extent that it alleges that Euros had more than four employees, and respectfully refer all questions of law to the Court.

13.      Admit the allegations set forth in Paragraph 13 of the Complaint.

14.      Admit the allegations set forth in Paragraph 14 of the Complaint.

15.      Deny the allegations set forth in Paragraph 15 of the Complaint.

16.      Admit the allegations set forth in Paragraph 16 of the Complaint to the extent they relate to Junior's residence but deny the remaining allegations therein.

17.      Deny the allegations set forth in Paragraph 17 of the Complaint.

18.      Deny the allegations set forth in Paragraph 18 of the Complaint.

19.      Deny the allegations set forth in Paragraph 19 of the Complaint.

20.      Admit the allegations set forth in Paragraph 20 of the Complaint and respectfully refer all questions of law to the Court.

## AS AND FOR AN ANSWER TO THE SECTION TITLED "FACTS"

21.      Admit the allegations set forth in Paragraph 21 of the Complaint.

22.      Admit the allegations set forth in Paragraph 22 of the Complaint to the extent that they indicate that Plaintiff was employed until Euros closed.

23.      Deny the allegations contained in Paragraph 23 of the Complaint.

24.      Deny the allegations contained in Paragraph 24 of the Complaint.

25.      Deny the allegations contained in Paragraph 25 of the Complaint.

26.      Deny the allegations contained in Paragraph 26 of the Complaint to the extent that no such incidents ever occurred and therefore no such objections were ever made.

27.      Deny the allegations contained in Paragraph 27 of the Complaint.

28.    Deny the allegations contained in Paragraph 28 of the Complaint to the extent that no such incidents ever occurred and therefore no such objections were ever made.

29.    Admit the allegations set forth in Paragraph 29 of the Complaint to the extent that it states that as the General Manager Plaintiff had access to the office.

30.    Deny the allegations contained in Paragraph 30 of the Complaint.

31.    Deny the allegations contained in Paragraph 31 of the Complaint to the extent that no such incidents ever occurred and therefore no such objections were ever made.

32.    Deny the allegations contained in Paragraph 32 of the Complaint.

33.    Deny the allegations contained in Paragraph 33 of the Complaint to the extent that no such incident ever occurred and therefore Plaintiff took no such action.

34.    Admit the allegations set forth in Paragraph 34 of the Complaint, to the extent that cameras were installed but deny that Plaintiff has the accurate date.

35.    Admit the allegations set forth in Paragraph 35 of the Complaint to the extent that Junior began monitoring the cameras because the suspicions of theft kept mounting.

36.    Deny the allegations set forth in Paragraph 36 of the Complaint, but admit that on several occasions Junior questioned Plaintiff with respect to her curious habit of going to the bathroom immediately after receiving money from the cashiers, but before depositing that money in the register that was located just a few feet away from where she received the money.

37.    Deny the allegations contained in Paragraph 37 of the Complaint.

38.    With respect to Paragraph 38 of the Complaint, lack knowledge and information sufficient to form a believe as to whether Plaintiff's mother was sick, but deny the remaining allegations therein.

39.     With respect to Paragraph 39 of the Complaint, lack knowledge and information sufficient to form a believe as to when Plaintiff's mother died, but deny the remaining allegations therein.

40.     With respect to Paragraph 40 of the Complaint, admit that as the General Manager Plaintiff was treated as an exempt employee and respectfully refer all questions of law to the Court.

41.     With respect to Paragraph 41 of the Complaint, admit that as the General Manager Plaintiff was treated as an exempt employee and respectfully refer all questions of law to the Court.

42.     With respect to Paragraph 42 of the Complaint, admit that on November 23, 2019, in frustration Mr. Quezada threw out his bible that was in the office next to the register, but deny that the bible belonged to Plaintiff or that it was on her desk.

43.     With respect to Paragraph 43 of the Complaint, admit that on November 23, 2019, in frustration and after receiving yet another round of tickets from the police and while throwing out his bible Mr. Quezada stated that it had only brought him bad luck.

44.     With respect to Paragraph 44 of the Complaint, admit that on November 23, 2019, when the police department effectively shut down Euros, Plaintiff and everyone else was terminated from employment.

45.     Deny the allegations contained in Paragraph 45 of the Complaint.

46.     Deny the allegations contained in Paragraph 46 of the Complaint to the extent that no such incidents ever occurred and therefore no such objections were ever made.

47.     Lack knowledge and information sufficient to form a belief as to the veracity of the allegations contained in Paragraph 47.

48.     With respect to Paragraph 48 of the Complaint, admit that once Plaintiff had been informed that her conversion scheme had been revealed, Defendants were approached by Plaintiff's attorney.

49.     With respect to Paragraph 49 of the Complaint, admit that once it was discovered that Plaintiff had stolen hundreds of thousands of dollars from Euros and Mr. Quezada, these individuals commenced an action against her to recover some of that money.

50.     Admit the allegations contained in Paragraph 50 of the Complaint but deny that it is a frivolous action, in fact the action is ongoing.

51.     Admit the allegations contained in Paragraph 51 of the Complaint but deny that embezzlement is the only claim; the lawsuit also seeks damages for fraud, conversion, unjust enrichment, and breach of fiduciary duty.

52.     Admit the allegations contained in Paragraph 52 of the Complaint to the extent it correctly points out that Defendants brought a third-party action against the Plaintiff, as the General Manager of Euros was an "employer" under the FLSA that was responsible for setting employee schedule and pay and should have been named in the law suit, but deny that it was a frivolous action.

53.     Admit the allegations in Paragraph 53 of the Complaint to the extent that Judge woods requires a pre-motion conference prior to the filing of any motion, but deny that there was any decision made with respect to the merits of the cross claim.

54.     Admit the allegations in Paragraph 54 of the Complaint.

55.     Admit the allegations in Paragraph 55 of the Complaint.

56.     With respect to Paragraph 56 of the Complaint, lack knowledge and information sufficient to form a belief as to the veracity Plaintiff's claims of emotional devastation, but deny any wrongdoing by Defendants.

57.     With respect to Paragraph 57 of the Complaint, lack knowledge and information sufficient to form a belief as to the veracity Plaintiff's claims of financial harm, but deny that Defendants have filed frivolous lawsuits or taken any other inappropriate action.

## AS AND FOR AN ANSWER TO THE SECTION
## TITLED "CAUSES OF ACTION – COUNT I"

58.     With respect to Paragraph 58 of the Complaint, Defendants repeat, reiterate, and re-allege each and every response to Paragraphs 1 through 57 of the Complaint as if set forth more fully herein.

59.     Deny the allegations contained in Paragraph 59 of the Complaint.

60.     Deny the allegations contained in Paragraph 60 of the Complaint.

61.     Deny the allegations contained in Paragraph 61 of the Complaint.

62.     Deny the allegations contained in Paragraph 62 of the Complaint.

63.     Deny the allegations contained in Paragraph 63 of the Complaint.

## AS AND FOR AN ANSWER TO THE SECTION
## TITLED "COUNT II"

1.     With respect to Paragraph 64 of the Complaint, Defendants repeat, reiterate, and re-allege each and every response to Paragraphs 1 through 63 of the Complaint as if set forth more fully herein.

64.     Deny the allegations contained in Paragraph 65 of the Complaint.

65.     Deny the allegations contained in Paragraph 66 of the Complaint.

66.     Deny the allegations set forth in Paragraph 67 of the Complaint.

7

67.     Deny the allegations set forth in Paragraph 68 of the Complaint.

**AS AND FOR AN ANSWER TO THE SECTION
TITLED "COUNT III"**

68.     With respect to Paragraph 69 of the Complaint, Defendants repeat, reiterate, and re-allege each and every response to Paragraphs 1 through 68 of the Complaint as if set forth more fully herein.

69.     Deny the allegations contained in Paragraph 70 of the Complaint.

70.     Deny the allegations contained in Paragraph 71 of the Complaint.

71.     Deny the allegations set forth in Paragraph 72 of the Complaint.

72.     Deny the allegations set forth in Paragraph 73 of the Complaint.

73.     Deny the allegations set forth in Paragraph 74 of the Complaint.

**AS AND FOR AN ANSWER TO THE SECTION
TITLED "COUNT IV"**

1.     With respect to Paragraph 75 of the Complaint, Defendants repeat, reiterate, and re-allege each and every response to Paragraphs 1 through 74 of the Complaint as if set forth more fully herein.

74.     Deny the allegations contained in Paragraph 76 of the Complaint.

75.     Deny the allegations contained in Paragraph 77 of the Complaint.

76.     Deny the allegations set forth in Paragraph 78 of the Complaint.

77.     Deny the allegations set forth in Paragraph 79 of the Complaint.

**AS AND FOR AN ANSWER TO THE SECTION
TITLED "COUNT V"**

2.     With respect to Paragraph 80 of the Complaint, Defendants repeat, reiterate, and re-allege each and every response to Paragraphs 1 through 79 of the Complaint as if set forth more fully herein.

78.     Deny the allegations contained in Paragraph 81 of the Complaint.

79.     Deny the allegations contained in Paragraph 82 of the Complaint.

80.     Deny the allegations set forth in Paragraph 83 of the Complaint.

81.     Lack knowledge and information sufficient to form a belief as to the veracity of the allegations contained in Paragraph 84 of the Complaint and respectfully refer all questions of law to the Court

82.     Deny the allegations set forth in Paragraph 84 of the Complaint.

## AS AND FOR AN ANSWER TO THE SECTION TITLED "COUNT VI"

3.     With respect to Paragraph 86 of the Complaint, Defendants repeat, reiterate, and re-allege each and every response to Paragraphs 1 through 85 of the Complaint as if set forth more fully herein.

83.     Deny the allegations contained in Paragraph 87 of the Complaint.

84.     Lack knowledge and information sufficient to form a belief as to the veracity of the allegations contained in Paragraph 88 of the Complaint and respectfully refer all questions of law to the Court

## AS AND FOR AN ANSWER TO THE SECTION TITLED "COUNT VII"

4.     With respect to Paragraph 89 of the Complaint, Defendants repeat, reiterate, and re-allege each and every response to Paragraphs 1 through 88 of the Complaint as if set forth more fully herein.

85.     Deny the allegations contained in Paragraph 90 of the Complaint.

86.     Deny the allegations contained in Paragraph 91 of the Complaint.

87.     Deny the allegations set forth in Paragraph 92 of the Complaint.

9

**AS AND FOR AN ANSWER TO THE SECTION**
**TITLED "COUNT VIII"**

5.     With respect to Paragraph 93 of the Complaint, Defendants repeat, reiterate, and re-allege each and every response to Paragraphs 1 through 92 of the Complaint as if set forth more fully herein.

88.     Deny the allegations contained in Paragraph 94 of the Complaint.

89.     Deny the allegations contained in Paragraph 95 of the Complaint.

90.     Deny the allegations set forth in Paragraph 96 of the Complaint.

**AS AND FOR AN ANSWER TO THE SECTION**
**TITLED "COUNT IX"**

6.     With respect to Paragraph 97 of the Complaint, Defendants repeat, reiterate, and re-allege each and every response to Paragraphs 1 through 96 of the Complaint as if set forth more fully herein.

91.     Deny the allegations contained in Paragraph 98 of the Complaint.

92.     Deny the allegations contained in Paragraph 99 of the Complaint.

93.     Deny the allegations set forth in Paragraph 100 of the Complaint.

94.     Deny the allegations set forth in Paragraph 101 of the Complaint.

**AS AND FOR AN ANSWER TO THE SECTION**
**TITLED "COUNT X"**

7.     With respect to Paragraph 102 of the Complaint, Defendants repeat, reiterate, and re-allege each and every response to Paragraphs 1 through 101 of the Complaint as if set forth more fully herein.

95.     Deny the allegations contained in Paragraph 103 of the Complaint.

96.     Deny the allegations contained in Paragraph 104 of the Complaint.

97.     Deny the allegations set forth in Paragraph 105 of the Complaint.

98.     Deny the allegations set forth in Paragraph 106 of the Complaint.

**AS AND FOR AN ANSWER TO THE SECTION
TITLED "COUNT XI"**

8.      With respect to Paragraph 107 of the Complaint, Defendants repeat, reiterate, and re-allege each and every response to Paragraphs 1 through 106 of the Complaint as if set forth more fully herein.

99.     Deny the allegations contained in Paragraph 108 of the Complaint.

100.    Deny the allegations contained in Paragraph 109 of the Complaint.

**AS AND FOR AN ANSWER TO THE SECTION
TITLED "COUNT XII"**

9.      With respect to Paragraph 109 of the Complaint, Defendants repeat, reiterate, and re-allege each and every response to Paragraphs 1 through 108 of the Complaint as if set forth more fully herein.

101.    Admit the allegations contained in Paragraph 111 of the Complaint.

102.    Deny the allegations contained in Paragraph 112 of the Complaint.

103.    Deny the allegations contained in Paragraph 113 of the Complaint.

104.    Deny the allegations set forth in Paragraph 114 of the Complaint.

105.    Deny the allegations set forth in Paragraph 115 of the Complaint.

**FIRST AFFIRMATIVE DEFENSE**

106.    Plaintiff failed to state a claim upon which relief can be granted.

**SECOND AFFIRMATIVE DEFENSE**

1.      To the extent that the period of time alluded to in Plaintiff's Complaint, or the period of time alleged later in this action, predates the limitations period set forth in Section 6(a)

of the Portal-to-Portal Act, 29 U.S.C §255 (a), or any similar state labor law, such claims of Plaintiffs are barred.

## THIRD AFFIRMATIVE DEFENSE

107.    To the extent that Defendants' actions taken in connection with Plaintiffs' compensation were done in good faith in conformity with and reliance upon written administrative regulations, orders, rulings, approvals, interpretations, and written and unwritten administrative practices or enforcement policies of the Administrator of the Wage and Hour Division of the United States Department of Labor and/or New York Department of Labor, Plaintiff's claims are barred in whole or in part by the provisions of Section 10 of the Portal-to-Portal Act, 29 U.S.C. § 259.

## FOURTH AFFIRMATIVE DEFENSE

1.    To the extent that any acts or omissions giving rise to this action were done in good faith and with reasonable grounds for believing that the actions or omissions were not a violation of the FLSA and/or NYLL, Plaintiff's claims are barred in whole or in part by the provisions of Section 11 of the Portal-to-Portal Act, 29 U.S.C § 260. This defense also may apply to the claims of some or all of the class of allegedly similarly situated persons.

## FIFTH AFFIRMATIVE DEFENSE

2.    Plaintiffs' claims are barred in whole or in part to the extent that the work they performed falls within exemptions, exclusions, exceptions, offsets or credits permissible under the FLSA and/or NYLL, including those provided for in 29 U.S.C §§ 207, 213.

## SIXTH AFFIRMATIVE DEFENSE

3.    Defendants, at all times, acted in good faith to comply with the FLSA and NYLL and with reasonable grounds to believe that their actions did not violate the FLSA and/or NYLL,

and Defendant asserts a lack of willfulness or intent to violate the FLSA and/or NYLL as a

defense to any claim by Plaintiff for liquidated damages.

### SEVENTH AFFIRMATIVE DEFENSE

4.     Plaintiff was not an "employee" of Defendants as defined by the FLSA and/or

NYLL.

### EIGHTH AFFIRMATIVE DEFENSE

5.     Defendants were not an "employer" of Plaintiff as defined by the FLSA and/or

NYLL.

### NINTH AFFIRMATIVE DEFENSE

6.     Plaintiff's claims are barred to the extent Plaintiff failed, refused, and/or neglected

to mitigate or avoid the damages complained of in Plaintiff's Complaint.

### TENTH AFFIRMATIVE DEFENSE

7.     To the extent applicable, Plaintiff's claims are barred by the doctrines of waiver,

unclean hands, collateral estoppel, and/or laches.

### ELEVENTH AFFIRMATIVE DEFENSE

8.     Plaintiff alleged injuries were not proximately caused by any unlawful policy,

custom, practice and/or procedure promulgated and/or tolerated by Defendants.

### TWELFTH AFFIRMATIVE DEFENSE

1.     To the extent that the period of time alluded to in the Complaint, or the period of

time alleged later in this action, predates the applicable limitations periods, such claims of

Plaintiff are barred.

### THIRTEENTH AFFIRMATIVE DEFENSE

1.       Plaintiffs' NYLL claims cannot lie, in whole or in part, to the extent Defendants are not covered by the New York Department of Labor Wage Order cited in Plaintiff's Complaint, or any other Wage Order.

## FOURTEENTH AFFIRMATIVE DEFENSE

1.       Insofar as Plaintiff purport to allege a claim or claims for physical or mental emotional distress, including claims for recovery of medical expenses thereby incurred, said claims are barred by the exclusive remedy provisions of the New York Workers' Compensation Law.

## FIFTEENTH AFFIRMATIVE DEFENSE

1.       Plaintiffs' lacks standing to file and/or prosecute this action against Defendants and/or to receive any attorney's fees.

## SIXTEENTH AFFIRMATIVE DEFENSE

1.       Plaintiffs' employer exercised reasonable care to prevent and promptly correct any purportedly discriminatory behavior in its workplace, and Plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities provided by Plaintiffs' employer or to otherwise avoid harm.

## SEVENTEENTH AFFIRMATIVE DEFENSE

1.       To the extent applicable, Plaintiffs have failed to exhaust any and all administrative or contractual remedies and/or conditions precedent which they were required to avail themselves of.

## EIGHTEENTH AFFIRMATIVE DEFENSE

1.       The Complaint fails to allege facts sufficient to allow recovery of punitive damages.

## NINETEENTH AFFIRMATIVE DEFENSE

1.  If Plaintiffs' sustained any injury, damage or loss by reason of any act, error or omission on the part of Defendants, said injury, damage or loss must be reduced on the basis of comparative fault or negligence of Plaintiffs, or others, which contributed to and proximately caused any such injury, damage or loss.

## TWENTIETH AFFIRMATIVE DEFENSE

1.  Some or all of the discriminatory or retaliatory acts Plaintiff alleges in the Complaint are not "adverse employment actions" and were not motivated by discriminatory or retaliatory animus.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

1.  Plaintiff's retaliation claims fail as a matter of law to the extent that Plaintiff did not engage in protected activity.

## STATEMENT OF AFFIRMATIVE DEFENSES AND OTHER DEFENSES

1.  Defendants reserve the right to plead additional separate and affirmative defenses, which may be ascertained during the course of discovery in this action or otherwise.  Defendants assert the foregoing affirmative and other defenses without assuming any burden of production or proof that it would not otherwise have.

## COUNTERCLAIMS AND CROSS CLAIMS

2.  Defendants allege, with knowledge as to their own acts, and upon information and belief as to all other matters as follows:

## INTRODUCTION

3.  For years Plaintiff and the Co-Conspirators (defined below) operated a racketeering scheme at Euros.

4.     The scheme, headed by Plaintiff, entailed stealing money from Euros – an all-cash business – and diverting it mostly for Plaintiff's benefit, by sending it to Africa.

5.     Since Plaintiff's international wire transfers had been flagged as inappropriate by Chase Bank, she sent money through the Co-Conspirators who, for a fee, were happy to engage in Plaintiff's illegal activity.

6.     However, when the City of New York shut down Euros on November 23, 2019, for failing to maintain a proper Certificate of Occupancy, the money stopped flowing.

7.     Shortly thereafter Plaintiff and defendant Jose Eladio Castro pounced; each commencing her/his own preposterous lawsuit.

8.     And thank God that they did, because a months' long investigation into those matters has revealed the heretofore unsuspected racketeering scheme that shows that from April 2017 until November 2019 Plaintiff and the Co-Conspirators stole at least $600,000 from the Defendants.

## NATURE OF THE ACTION

9.     Defendants bring this action against Plaintiff and the Co-Conspirators (defined below) because each of them, in a brazenly and lawless manner did participate in, facilitate, aid, abet, counsel, induce and/or conspired to engage in a myriad of illegal activities including, without limitation, racketeering in violation of 18 U.S.C. §§ 1962(c) and (d) (RICO); wire fraud in violation of 18 U.S.C. § 1343; money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B), (a)(2)(B), and (a)(3)(B); engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a); interstate transportation of stolen property in violation of 18 U.S.C. § 2314, and conversion.

10.     In layman's terms, Plaintiff and the Co-Conspirators were engaged in scheme to

steal from Defendants and send, via wire transfers, bank deposits and remittances, approximately six hundred thousand dollars ($600,000) of Defendants' money to agents in Africa for their benefit.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over the subject matter of this action pursuant to the Racketeer Influenced and Corruption Organizations Act, 18 U.S.C. § 1961 *et seq.* (RICO), 28 U.S.C. §§ 1331 (federal), 1337 (commerce) and 1367 (supplemental).

12.    Personal jurisdiction and venue in this district are proper pursuant to 18 U.S.C. §1965 and 28 U.S.C. § 1391(b) because (i) Plaintiff and the Co-Conspirators are found in, have agents and transact their business and affairs in this district, and (ii) a substantial part of the events or omissions giving rise to the claims for relief occurred in this district.

## PARTIES

**Defendants/Cross claim Plaintiffs**

13.    Euros El Tina Restaurant Lounge and Billiards Corp. ("Euros") is domestic corporation duly organized and existing under the laws of the State of New York.

14.    Euros principal place of business was located in 500 West 207th Street, New York, New York 10034.

15.    Santiago Quezada ("Quezada") is the owner of Euros.

16.    Mr. Quezada is a resident of Westchester County, New York.

17.    Santiago Quezada, Jr. ("Junior") is Mr. Quezada's son.  While having no direct association with Euros, Junior sometimes served as his father's proxy in supervising the affairs of Euros.

18.    Junior is a resident of Westchester County, New York.

19.     For the sake of consistency with the initial Complaint, Euros, Quezada and Junior are collectively referred to as "Defendants".

**Plaintiff and the Co-Conspirators**

20.     Plaintiff/cross claim defendant Maria Jose Pizarro a.k.a. Maria Pizarro ("Plaintiff") is a resident of Queens County, State of New York.

21.     Plaintiff was the General Manager of Euros during its entire operation.

22.     An initial investigation has revealed that Plaintiff was the ringleader in the scheme to defraud the Defendants.

23.     Defendant Jose Eladio Castro (hereinafter "Castro") is a promoter hired by the Defendants to bring in acts and attract business to Euros during the period in question.

24.     Mr. Castro is a resident of Kings County, New York.

25.     Initial investigations reveal that Mr. Castro had both an amorous and business relationship with the Plaintiff during the period in question.

26.     Defendant Eladio Castro Productions Inc. (hereinafter "Productions") was a company founded and authorized to do business within the State of New York from March 19, 2013, to October 26, 2016, when its authority to do business was annulled by the New York State Department of State.

27.     Productions was headquartered at 69 Nichols Avenue, Kings County, New York 11208.

28.     Mr. Castro was the sole owner and President of Productions. At all times relevant herein Mr. Castro used Productions as his alter ego.

29.     Even after Productions was declared Inactive by the New York State Department of State, Mr. Castro continued to do business (i.e., enter into contracts, maintain bank accounts,

write checks and cash checks) under the name of Productions.

30.     Defendant Emiton Fernandez a.k.a. Emilio Fernandez ("Fernandez") was a security guard who worked at Euros during the period in question.

31.     Mr. Fernandez is a resident of New York county, New York.

32.     Defendant Narciso Gomez ("Gomez") was an employee of Euros during the period in question.

33.     Mr. Gomez is a resident of New York county, New York.

34.     Defendant Zoilimar Mejia a.k.a. Zulimar Mejia ("Mejia") was an employee of Euros during the period in question

35.     Ms. Mejia is a resident of New York county, New York.

36.     Defendant Tomas Andres Pizarro Zepeda ("T. Pizarro") is Plaintiff's brother.

37.     T. Pizarro is a resident of Queens county, New York.

38.     Defendants Castro, Productions, Fernandez, Mejia, Rodriguez, Gomez, and T. Pizarro are hereinafter collectively referred to as the Co-Conspirators.

39.     With the exception of defendant T. Pizarro, all of the Co-Conspirators worked for or were associated with Euros.

40.     With the Exception of T. Pizarro, all of the Co-Conspirators were hired, contracted by or supervised by Plaintiff during the relevant time period.

41.     At all relevant times herein the Co-Conspirators ratified, authorized, ordered, directed, participated in, or had actual knowledge of each of the racketeering, tortious and unlawful acts stated described below designed to defraud the Defendants.

42.     At all relevant time herein Plaintiff and the Co-Conspirators acted in their personal capacity and together in order to conduct their illegal activities.

19

## STATEMENT OF FACTS

**Background: Plaintiff the Boss with no Supervision**

43.     Mr. Quezada has been the owner of El Tina Fish Market (the "Fish Market") and Lina Restaurant since the 1990s.

44.     Both establishments are located on the ground floor of the property located at 500 West 207th Street, New York, New York 10034.

45.     Beneath the Fish Market, in the basement of property located at 500 West 207th Street, was a pool lounge called Washington Heights Billiards that was owned by the Plaintiff and her husband Eduardo Torres.

46.     Since there were constant disputes that arose due to leaks into the pool lounge, that may have been the result of activities at the Fish Market, the parties arrived at an amicable solution.  Mr. Quezada agreed to purchase the pool lounge from Plaintiff and her husband.

47.     And so it was that on August 17, 2010, Euros was formed and thereafter came to occupy the basement of the property located at 500 West 207th Street, New York, New York.

48.     More importantly still, since the sole purpose of the purchase was to avoid any additional dispute with the downstairs tenants, and since Mr. Quezada had no interest in operating a pool lounge or any other business at that location, he hired the Plaintiff, who had just sold him the business, to manage the operations of Euros from thereon.

49.     From its inception Euros operated as a bar restaurant and lounge and was only open three days a week – Friday, Saturday and Sunday.

50.     From the day it opened until the day it closed, Plaintiff was the only manager of Euros.  She hired, fired, and set schedules for the staff. She contracted vendors, ordered supplies, and managed all of Euro's finances.

20

51.     Euros was a predominantly cash business with credit card sales accounting for only a small fraction of overall income.

52.     For the majority of the time that Euros was open, there were very few controls and no checks and balances on the Plaintiff.

53.     For example, up until November 2018 Euros' entire security apparatus was comprised of a bouncer only and no working surveillance system.

54.     When a working surveillance system was finally installed, the system was made up of a series of cameras all of which presented their findings to Plaintiff on a large TV screen in Plaintiff's office.

55.     Even the camera pointing at the register inside Plaintiff's office presented the image on the TV Screen next to the register inside Plaintiff's office.

**Background: Plaintiff's Various Love Interests**

56.     While it is not known for sure whether Plaintiff and Eduardo Torres remain married, what is apparent is that during the time of her employment at Euros, Plaintiff was involved with various individuals.

57.     Each of those relationships provided a motive and an opportunity for committing fraud.

58.     In addition to her relationship with Eduardo Torres, Defendants investigation has revealed that Plaintiff and defendant Castro engaged in an amorous relationship that dates at least as far back as 2012.

59.     While it is irrelevant whether this relationship ran concomitantly with Plaintiff's marriage to Mr. Torres, during the entire time that Plaintiff was involved with Mr. Castro she continued to employ his services and the services his company – defendant Productions - at

Euros.

60.      Moreover, during her trips to see her husband in Mexico (Plaintiff is Chilean and Mr. Torres is Mexican), Plaintiff often left Mr. Castro, presumably an independent contractor, in charge of the operations at Euros.

61.      In 2017 there is evidence to suggest that Plaintiff became involved with a person named Christian Darren.  It is unclear whether Mr. Darren is a real person or just a fictitious name used by internet schemers.

62.      Either way it is apparent that under the ruse of a loving relationship with Mr. Darren, Plaintiff was convinced to send copious amounts of money to his "handlers" in Africa for vacation releases, stolen luggage and even a marriage certificate.

63.      At some point in 2019 while still married to Mr. Darren, and maybe even to Mr. Torres, Plaintiff became involved in yet another internet relationship with a person claiming to be called Stephen Thomas, who also absconded with approximately $60,000.

64.      In total, and by her own accounts, Plaintiff spent no less than $545,000 (although we've calculated significantly more) on her love interests in the two and half year period from January 2017 to November 2019 (hereinafter, the "Relevant Time Period").

**Background: Plaintiff's Wages**

65.      During the Relevant Time Period, Plaintiff only had one job and, as far as can be determined, only one legal source of income. She was the Manager at Euros.

66.      As stated previously Euros was only open three days of the week – Friday, Saturday, and Sunday – and during those three days for only a handful of hours 7:00 PM to 4:00 AM.

67.      Plaintiff's Schedule, as set by herself, was normally 8:00 PM to 4:00 AM.

22

68.     For those 24 hours of work, Plaintiff was paid $1100 per week, in cash, for an annual salary of approximately $57,200 per year.

69.     Notwithstanding her actual salary, Plaintiff asked that her income be under-reported. As a result, Plaintiff was reported to have earned an income of $12 per hour for 20 hours per week (i.e. $240) for a grand total of roughly $12,480 per year.

70.     Either way, whether she was making $57,200 per year or $12,480 per year, she could not possibly have transferred nearly $600,000 out of the country in a two-year period without engaging in illicit activity – in this case, stealing from Defendants with the aid of the Co-Conspirators.

71.     To be sure, at the same time that Plaintiff was sending hundreds of thousands of dollars abroad, Plaintiff was applying for and being turned down on mortgages of as little as $300,000.00.

**Overview of The Fraudulent Scheme**

72.     In a tale that is stranger than fiction Plaintiff fell in love over the internet and was convinced to send money to her lover.  Thereafter, she devised a scheme, with the aid of the Co-Conspirators, to send vast amounts of money to her love interest without being hindered by the banking authorities.

73.     At some point Plaintiff became aware that she was being scammed and reached out the authorities, where another group of fraudsters passing themselves off as the FBI convinced her to send them even more money.

74.     Undeterred by her previous experiences, in 2019 Plaintiff goes on yet another online dating website where another gentleman convinces her to send him even more money.

75.     During this entire period Plaintiff is both victim and victimizer, stealing from the Defendants and paying off the Co-Conspirators in order to send money to the people that are defrauding her.

**Internet Scam 1 – Christian Darren**

76.     Sometime in early 2017, whether in between or in addition to Plaintiff's relationships with Messrs. Torres and Castro, she met a person claiming to be called Christian Darren on an online dating website.

77.     Mr. Darren was allegedly a member of the United States Armed Forces who purported to be madly in love with the Plaintiff.

78.     Unfortunately for Plaintiff (and as we have recently learned, Defendants) Mr.

24

Darren had a series of problems that required Plaintiff's assistance and money in order to be resolved.

79.    For example, in May 2017, a communication from Military Command in Afghanistan claims that that they will need $28,500 in order to obtain the "holiday certificate" and permissions that are necessary to allow Mr. Darren to take a vacation so that he can visit the Plaintiff.

80.    The request provides specific instructions for how the money should be sent, namely via 1) Western Union, 2) Money Gram, or 3) RIA Money.

81.    Separately it is explained that the money should be sent to certain individuals in Ghana.

82.    Having previously been flagged by her bank – Chase – for engaging in what appeared to be illicit transactions, Plaintiff, engages the Co-Conspirators to assist her in funneling the money to Ghana.

83.    The Co-Conspirators, for a fee, were more than happy to indulge Plaintiff. As result the following series of transactions transpired, in May and early June 2017:

*The Request: send $28,550 via 1) Western Union, 2) Money Gram 3) Ria*

*Money*

MILITARY COMMAND,AFGHANISTAN PEACE KEEPING,NO 22 CAMP UNIT 9, May 2017

Hello, Mrs Maria Jose,
Greetings to you from the MILITARANY BASE..We apologize for the delay in the response due to the increasing number of soldi
inform you about a maximum of seven days is dedicated to signature processing and holiday document.
During this period of 7 days (1 week), which is expected to pay the holiday taxes required processing of documents are not lapse
to additional fees.We are peering you this missive base on the request concerning the MILITARY FREEDOM (Exit) certificate for
your request via the MILITARY COMMAND, The holiday certificate processing fees listed below should choose the country and t
you and come back to us to start immediately processing.we advice you to meet up to the following demand to enable us proces
requirements are stated below:

1 Full Name:

2 Current Home Address:

3 Current Office Address:

4 Mobile Number:

5 A processing Fee and your sign on the vacation document : $28,550USD

METHOD FOR EASY PAYMENT
other payment is strictly done through any of these methods
1) WESTERN UNION
2) MONEY GRAM
3) RIA MONEY

*The Compliance: Plaintiff and Co-Conspirators send money as instructed*



CUSTOMER COPY/COPIA DEL CLIENTE
MoneyGram Payment Systems, Inc.
1550 Utica Ave S
Minneapolis, MN 55416
1(800)926-9400
www.moneygram.com

BAO TONG INC.

017069616901
Date/Fecha: 5/7/2017 Time/Hora: 12:48 PM

Sender Information/
Información del remitente:
MARIA JOSE PIZARRO
111 67 41 ST
CORONA, NY 11368
Phone/Teléfono: 3479650491

Recipient Information/
Información del destinatario:
ENAMEGUONO VICTOR MAMU

Expected Destination/Destino Esperado:
GHA - Ghana -
10 Minute Service - GHS / Servicio 10 minutos - GHS

Reference Number/
N.º de referencia

63840089

Date Available in Receive Country/
disponible en país de desti
be available sooner*
e estar disponible antes*                          5/7/2017

ansfer Amount/
nto de la transferencia:
nsfer Fees/
fe de la transferencia:                            1500.00 USD
sfer Taxes/
estos de la transferencia                          +30.00 USD
                                                   +0.00 USD

                                                   1530.00 USD

e Rate/
cambio:                                            1 USD = 4.1535 GHS

Amount/
la transferencia:                                  6230.2?

CUSTOMER COPY/COPIA DEL CLIENTE

MoneyGram Payment Systems, Inc.
1550 Utica Ave S
Minneapolis, MN 55416
1(800)926-9400
www.moneygram.com

SECURE SHIPPING & WIRE

8730041600015080026077
Date/Fecha: 5/8/2017 Time/Hora: 9:38 AM

Sender Information/
Información del remitente:
MARIA JOSE PIZARRO
111 87 41 ST
CORONA, NY 11368
Phone/Teléfono: 3479650491

Recipient Information/
Información del destinatario:
FAUZIYA YUSSIF

Expected Destination/Destino Esperado:
GHA - Ghana
10 Minute Service - GHS / Servicio 10 minutos - GHS

| | |
|---|---|
| Reference Number/ N.º de referencia | 21147473 |
| Date Available in Receive Country/ Fecha disponible en país de desti *May be available sooner* *Puede estar disponible antes* | 5/8/2017 |
| Transfer Amount/ Monto de la transferencia: | 2000.00 USD |
| Transfer Fees/ Tarifa de la transferencia: | +40.00 USD |
| Transfer Taxes/ Impuestos de la transferencia | +0.00 USD |
| Total/ Total: | 2040.00 USD |
| Exchange Rate/ Tipo de cambio: | 1 USD = 4.1535 GHS |
| Transfer Amount/ Monto de la transferencia: | 8307.16 GHS |
| Other Fees/ Otras tarifas: | +0.00 GHS |
| Other Taxes/ Otros impuestos: | +0.00 GHS |



MoneyGram

CUSTOMER COPY/COPIA DEL CLIENTE

MoneyGram Payment Systems, Inc
1550 Utica Ave S
Minneapolis, MN 55416
1(800)926-9400
www.moneygram.com

JEG COMMUNICATION INC DW

856007960001428000802
Date/Fecha: 5/8/2017 Time/Hora: 11:47 AM

Sender Information/
Informacion del remitente:
JOSE E CASTRO
MoneyGram Plus/MoneyGram Plus: 1734642035228
69 NICHOLS AVE
BROOKLYN, NY 11208
Phone/Teléfono: 3472893265

Recipient Information/
Informacion del destinatario:
FAUZIYA YUSSIF

Expected Destination/Destino Esperado:
GHA - Ghana
10 minute Service - GHS / Servicio 10 minutos - GHS

| | |
|---|---|
| Reference Number/<br>N.º de referencia | 20324053 |
| Date Available in Receive Country/<br>Fecha disponible en país de desti<br>*May be available sooner*<br>*Puede estar disponible antes* | 5/8/2017 |
| Transfer Amount/<br>Monto de la transferencia: | 1500.00 USD |
| Transfer Fees/<br>Tarifa de la transferencia: | +30.00 USD |
| Transfer Taxes/<br>Impuestos de la transferencia | +0.00 USD |
| Total/<br>Total: | 1530.00 USD |
| Exchange Rate/<br>Tipo de cambio: | 1 USD = 4.1535 GHS |
| Transfer Amount/<br>Monto de la transferencia: | 6230.37 GHS |
| Other Fees/<br>Otras tarifas: | -0.00 GHS |
| Other Taxes/<br>Otros impuestos: | -0.00 GHS |
| Total to Recipient/<br>Total para el destinatario: | 6230.37 GHS |

Recipient may receive less due to fees charged by the recipient's bank and foreign taxes./El recipiente pueda recibir menos debido a honorarios cobrados por banco del recipiente e impuestos extranjeros.

CUSTOMER COPY/COPIA DEL CLIENTE

MoneyGram Payment Systems, Inc.
1550 Utica Ave S
Minneapolis, MN 55416
1(800)926-9400
www.moneygram.com

SECURE SHIPPING & WIRE

8730041600015080026077
Date/Fecha: 5/17/2017 Time/Hora: 12:00 PM

Sender Information/
Información del remitente:
MARIA JOSE PIZARRO
111 87 41 ST
CORONA, NY 11368
Phone/Teléfono: 3479650491

Recipient Information/
Información del destinatario:
ENAMEGUONO VICTOR MAMU

Expected Destination/Destino Esperado:
GHA - Ghana
10 Minute Service - GHS / Servicio 10 minutos - GHS

| | |
|---|---|
| Reference Number/ N.º de referencia | 58044486 |
| Date Available in Receive Country/ Fecha disponible en país de desti *May be available sooner* *Puede estar disponible antes* | 5/17/2017 |
| Transfer Amount/ Monto de la transferencia: | 1000.00 USD |
| Transfer Fees/ Tarifa de la transferencia: | +16.00 USD |
| Transfer Taxes/ Impuestos de la transferencia | +0.00 USD |
| Total/ Total: | 1016.00 USD |
| Exchange Rate/ Tipo de cambio: | 1 USD = 4.1097 GHS |
| Transfer Amount/ Monto de la transferencia: | 4109.75 GHS |
| Other Fees/ Otras tarifas: | +0.00 GHS |
| Other Taxes/ | |





www.moneygram...

COMPU BUKAROS CORP

506985791901
Date/Fecha: 5/18/2017 Time/Hora: 2:10 PM

Sender Information/
Información del remitente:
MARIA JOSE PIZARRO
111 87 41 ST
CORONA, NY 11368
Phone/Teléfono: 3479650491

Recipient Information/
Información del destinatario:
Enaeseuono Favour Avverosoua

Expected Destination/Destino Esperado:
GHA - Ghana
10 Minute Service - GHS / Servicio 10 minutos - GHS

Reference Number/
N.º de referencia                          78490076

Date Available in Receive Country/
Fecha disponible en país de desti
*May be available sooner*                   5/18/2017
*Puede estar disponible antes*

Transfer Amount/
Monto de la transferencia:                1000.00 USD
Transfer Fees/
Tarifa de la transferencia:                +16.00 USD
Transfer Taxes/
Impuestos de la transferencia
                                            +0.00 USD
otal/
otal:
                                          1016.00 USD
xchange Rate/

34



Thank You / Gracias

Tracking Number (MTCN) /
NO. de Control del Envío (MTCN):
925-456-4515

For Customer Service, please call 1-800-325-6000 /
Para comunicarse con el servicio de atención al
cliente, llame al 1-800-325-6000

PAYOMATIC CORP
81-18 NORTHERN BLVD
JACKSON HEIGHTS, NY, USA

Money Transfer / Envio de Dinero
Cash / Dinero en efectivo

Operator ID / No. ID del Operador: 3008

Date of Transaction / Fecha de Transaccion
May 19, 2017 / Mayo 19, 2017

Time of Transaction / Hora de la Transacción
12 21 PM EST

Sender / Remitente
BRUNILDA J RODRIGUEZ
2851 WEBB AVE, BRONX, NY 10468
7185819499

Receiver / Destinatario
ENAMEGUONO FAVOUR AVWEROSOUO

Expected Payout Location /
Localidad donde se Espera Pago
Ghana / Ghana



1(800)926-9400
www.moneygram.com

## MONEYGRAM OF NEW YORK # 17 DW

8270032890170680018752
Date/Fecha: 5/24/2017 Time/Hora: 3:07 PM

### Sender Information/
### Información del remitente:
BRUNILDA RODRIGUEZ
2851 WEBB AVE 3D
BRONX, NY 10468
Phone/Teléfono: 7185819499

### Recipient Information/
### Información del destinatario:
FAUZIYA YUSSIF

Expected Destination/Destino Esperado:
GHA - Ghana
10 Minute Service - GHS / Servicio 10 minutos - GHS

Reference Number/
N.º de referencia                    68181507

Date Available in Receive Country/
Fecha disponible en país de desti
*May be available sooner*            5/24/2017
*Puede estar disponible antes*

Transfer Amount/
Monto de la transferencia:
Transfer Fees/                       1000.00 USD
Tarifa de la transferencia:
Transfer Taxes/                      +16.00 USD
Impuestos de la transferencia
                                     +0.00 USD
Total/
Total:
                                     1016.00 USD
Exchange Rate/



CUSTOMER COPY/COPIA DEL CLIENTE

MoneyGram Payment Systems, Inc.
1550 Utica Ave S
Minneapolis, MN 55416
1(800)926-9400
www.moneygram.com

FOODTOWN # 524

8700077400014200023960
Date/Fecha: 5/27/2017 Time/Hora: 12:10 PM

Sender Information/
Información del remitente:
EMILTON FERNANDEZ
534 W 153RD ST #15
NEW YORK, NY 10031
Phone/Teléfono: 3479077715

Recipient Information/
Información del destinatario:
FAUZIYA YUSSIF

Expected Destination/Destino Esperado:
GHA - Ghana
10 Minute Service - GHS / Servicio 10 minutos - GHS

| | |
|---|---|
| Reference Number/ N.º de referencia | 93694575 |
| Date Available in Receive Country/ Fecha disponible en país de desti *May be available sooner* *Puede estar disponible antes* | 5/27/2017 |
| Transfer Amount/ Monto de la transferencia: | 2000.00 USD |
| Transfer Fees/ Tarifa de la transferencia: | +40.00 USD |
| Transfer Taxes/ Impuestos de la transferencia | +0.00 USD |
| Total/ Total: | 2040.00 USD |
| Exchange Rate/ Tipo de cambio: | 1 USD = 4.2529 GHS |
| Transfer Amount/ Monto de la transferencia: | 8505.84 GHS |
| Other Fees/ Otras tarifas: | |
| Taxes/ Impuestos: | |

37



 **CHASE** 🏦
**Consumer International Wire Transfer Combined Disclosure and Receipt**

JPMorgan Chase Bank, N.A.
East Elmhurst and 31st Ave
7701 31st Ave
East Elmhurst, NY 11370-1815

| | |
|---|---|
| **Today's Date:**  May 22, 2017 | **Date Funds Available to Recipient:**  May 31, 2017 |
| **Wire Transfer Date:** May 22, 2017 | **Chase Wire Tracking Number:**  J3DJ9ZNO00PV |

**SENDER:**
 MARIA J PIZARRO
 11187 41ST AVE
 CORONA, NY 11368-2621

 (347) 965-0491
**RECIPIENT:**
 Amamata Nuhu

 0583014476880501

**RECIPIENT BANK:**
 ECOBANK GHANA
 RIDGE (WEST),19 SEVENTH AVENUE, RIDGE-WEST,
 ACCRA, GHA

 ECOCGHACXXX

**Exchange Rate:  $1 USD = 1 USD**

| **Amount to be Deducted from Your Account:** | | **Amount to be Received by the Recipient:** | | |
|---|---|---|---|---|
| Transfer Amount: | $9,050.00 | Transfer Amount: | 9,050.00 | *USD* |
| Transfer Fees: | +$50.00 | Estimated Other Fees:* | -15.00 | *USD* |
| Transfer Taxes: | +$0.00 | | | |
| **Total:** | **$9,100.00** | Estimated Total to Recipient | 9,035.00 | *USD* |
| | | *charged by other institutions | | |

*The recipient may receive less due to fees charged by the recipient's bank and foreign taxes.*

**If you provided us an incorrect account number for the Recipient or an incorrect routing or identification number for the
Recipient's bank, you could lose the amount of the transfer.**

You have a right to dispute errors in your transaction. If you think there is an error, contact us within 180 days at 1-888-434-3030 or
send an account inquiry via Secure Message Center on chase.com.  You can also contact us for a written explanation of your rights.

You can cancel this wire transfer at no cost within 30 minutes after you have authorized us to send this wire transfer.  Please contact
1-800-935-9935 or visit a Chase branch.

If you have question or complaints about JPMorgan Chase Bank, N.A. contact:
        Consumer Financial Protection Bureau
        1-855-411-2372
        1-855-729-2372 (TTY/TDD)
        www.consumerfinance.gov



Page 1 of 2                            M1211-13-CS WPDP (11/16)

Date/Fecha: 5/31/2017   Time/Hora: 3:42 PM

**Sender Information/**
**Información del remitente:**
[illegible]
150-44 ELX AVE ZE 40
NEW YORK, NY 10038
Phone/Teléfono: 347366[illegible]

**Recipient Information/**
**Información del destinatario:**
EMMEGUENO VICTOR MAKU

Expected Destination/Destino Esperado:
GHA - Ghana
10 Minute Service - GHS / Servicio 10 minutos - GH.

Reference Number/
N.º de referencia

59637E16

Date Available in Receive Country/
Fecha disponible en país de desti
*May be available sooner*
*Puede estar disponible antes*

5/31/2017

Transfer Amount/
Monto de la transferencia:                    2000.00 USD
Transfer Fees/
Tarifa de la transferencia:                    +40.00 USD
Transfer Taxes/
Impuestos de la transferencia                  +0.00 USD

Total/
Total:                                         2040.00 USD

Exchange Rate/
Tipo de cambio:                          1 USD = 4.2460 GH·

Transfer Amount/
Monto de la transferencia:                     8492.01 GH·
Other Fees/
Otras tarifas:                                 -0.00 GH·
Other Taxes/
Otros impuestos:                               -0.00 GH·

Total to Recipient/
Total para el destinatario:                    8492.01 GH·

Recipient may receive less due to fees charged by the
recipient's bank and foreign taxes./El recipiente puede
recibir menos debido a honorarios cobrados por banco del
recipiente e impuestos extranjeros.

39

FOODTOWN # 524

07000774000142800039960
Date/Fecha: 6/5/2017 Time/Hora: 3:00 PM

## Sender Information/
## Información del remitente:
NARCISO GOMEZ
534 WEST 153 STREET APT 15
NY, NY 10031
Phone/Teléfono: 6463392450

## Recipient Information/
## Información del destinatario:
ENAMEGUONO VICTOR MAMU

Expected Destination/Destino Esperado:
GHA - Ghana
10 Minute Service - GHS / Servicio 10 minutos - GHS

| | |
|---|---|
| Reference Number/ N.º de referencia | 16524885 |
| Date Available in Receive Country/ Fecha disponible en país de desti *May be available sooner* *Puede estar disponible antes* | 6/5/2017 |
| Transfer Amount/ Monto de la transferencia: | 2000.00 USD |
| Transfer Fees/ Tarifa de la transferencia: | +40.00 USD |
| Tránsfer Taxes/ Impuestos de la transferencia | +0.00 USD |
| Total/ Total: | 2040.00 USD |
| Exchange Rate/ Tipo de cambio: | 1 USD = 4.2412 GHS |
| Transfer Amount/ Monto de la transferencia: | 8482.52 GHS |
| Other Fees/ Otras tarifas: | +0.00 GHS |
| Other Taxes/ Otros impuestos: | +0.00 GHS |

Total to Recipient/

Sender Information/
Información del remitente:
NARCISO GOMEZ
534 WEST 153 STREET APT 15
NY, NY 10031
Phone/Teléfono: 6463392450

Recipient Information/
Información del destinatario:
FAUSIYA YUSSIF

Expected Destination/Destino Esperado:
GHA - Ghana
10 Minute Service - GHS / Servicio 10 minutos - GHS

Reference Number/
N.º de referencia                              74609430

Date Available in Receive Country/
Fecha disponible en país de desti              6/5/2017
*May be available sooner*
*Puede estar disponible antes*

Transfer Amount/
Monto de la transferencia:                 1000.00 USD
Transfer Fees/
Tarifa de la transferencia:                 +16.00 USD
Transfer Taxes/
Impuestos de la transferencia                +0.00 USD

Total/
Total:                                     1016.00 USD

Exchange Rate/
Tipo de cambio:                       1 USD = 4.2412 GHS

Transfer Amount/
Monto de la transferencia:                 4241.26 GHS
Other Fees/
Otras tarifas:                                -0.00 GHS
Other Taxes/
Otros impuestos:                              -0.00 GHS

Total to Recipient/
Total para el destinatario:                4241.26 GHS

Recipient may receive less due to fees charged by the
recipient's bank and foreign taxes./El recipiente puede
recibir menos debido a honorarios cobrados por banco del
recipiente e impuestos extranjeros.

You have a right to dispute errors in your transaction.
think there is an error, contact us within 180

*Confirmation that payment was made*

**CHRISTIAN DARREN-ALL VACATION FEES PAID**  Inbox   x

**Maria Pizarro**
HI ON BEHALF MY HUSBAND CHRISTIAN DARREN I PAID ALL FEES REQUESTED FOR HIS VA...

**Military Base**
Hello Madam, How are you doing today and hope you are having a great weekend,...

**Military Base** <basemilitary716@gmail.com>
to me



84.     In summary, there was a request made to Plaintiff for $28,550 to be sent via either of three methods so that Mr. Darren could be allowed to go on vacation.   Then there were a series of payments, totaling $28,550, sent by Plaintiff and her Co-Conspirators as instructed, and a subsequent email from Plaintiff confirming that the request was complied with.   The transaction summary is as follows:

| 5/7/2017 | PLAINTIFF | ENAMEGUONO VICTOR MAMU / Ghana | $1,500.00 | Money Gram Transfer |
|---|---|---|---|---|
| 5/8/2017 | PLAINTIFF | FAUZIYA YUSSIF/ Ghana | $2,000.00 | Money Gram trans |
| 5/8/2017 | CASTRO | ENAMEGUONO VICTOR MAMU / Ghana | $1,500.00 | Money Gram Transfer |
| 5/8/2017 | CASTRO | FAUZIYA YUSSIF / Ghana | $1,500.00 | Money Gram Transfer |
| 5/17/2017 | PIZARRO | ENAMEGUONO VICTOR MAMU / Ghana | $1,000.00 | Money Gram Transfer |
| 5/18/2017 | PIZARRO | FAUZIYA YUSSIF/ Ghana | $1,000.00 | Money Gram Transfer |
| 5/18/2017 | PIZARRO | ENAMEGUONO FAVOUR AVWEROSOUO / Ghana | $1,000.00 | Money Gram Transfer |
| 5/18/2017 | PIZARRO | FAUZIYA YUSSIF/ Ghana | $1,000.00 | Money Gram Trans |
| 5/19/2017 | RODRIGUEZ | ENAMEGUONO FAVOUR AVWEROSOUO / Ghana | $1,000.00 | Western Union Trans |
| 5/24/2017 | RODRIGUEZ | FAUZIYA YUSSIF / Ghana | $1,000.00 | Money Gram Transfer |
| 5/22/2017 | PLAINTIFF | AMAMATA NUHU / Ecobank Ghana | $9,050.00 | Chase Wire Transfer |
| 5/27/2017 | FERNANDEZ | FAUZIYA YUSSIF / Ghana | $2,000.00 | Money Gram Transfer |
| 5/31/2017 | MEJIA | ENAMEGUONO VICTOR MAMU / Ghana | $2,000.00 | Money Gram Transfer |
| 5/6/2017 | GOMEZ | ENAMEGUONO VICTOR MAMU / Ghana | $2,000.00 | Money Gram Transfer |
| 5/6/2017 | GOMEZ | FAUSIYA YUSSIF / Ghana | $1,000.00 | Money Gram Transfer |

The person identified herein as Brunilda Rodriguez was a Bartender at Euros in addition to being a friend and confidant of the Plaintiff during the period in question.  She is not named as a defendant in this action.

| | | | | |
|---|---|---|---|---|
| | | | | |
| Total | | | $28,550.00 | |

85.     Note that the majority of the transfers, except for Plaintiff's, coincide with the weekends – usually during or the Monday after a weekend.

86.     Equally interesting is how this diverse group on individuals seem to have the same three friends in Ghana.

87.     Far from coincidence, however, the information provided above is merely a sliver of the amount of money swindled out of the country by Plaintiff and her Co-Conspirators.

88.     The pattern was always the same.  A demand for money would be made to Plaintiff based on Mr. Darren's needs at the time. The weekend would come. Euros would open and make money.  For a "processing fee" – of several hundred up to several thousands of dollars in the case of Mr. Castro – the Co-Conspirators would assist Plaintiff in taking it from the Defendants and shipping it by any means necessary to the desired location outside of the United States.  The demand would be satisfied, and a new cycle would ensue.

89.     Plaintiff ran the entire operation from her office at Euros.

90.     The Co-Conspirators, all but one employed at Euros, knew exactly where the money was coming from and helped the Plaintiff steal it.

91.     All of the Co-Conspirators were active participants transmitting or causing to be transmitted stolen property to out of state actors.

92.     A small sampling of the requests are evidenced by the following email exchanges:

*Request: $11,200 to secure clearance certificates for luggage*

James Renolds <undiplomaticagentrenolds122@gmail.com>            Sun, Apr 2, 2017 at 4:42 PM
To: maryjop621@gmail.com

Hello madam Thanks for providing us your information....With due respect madam hoke I here by advice you to come
with the sum of 11,200 USD to enable me secure the clearance certificates to your husband Luggage. .Immediately t̶
archive I will forward you a copy of the clearance certificates so that's you Will know and have a prove of what you  pay ·.
..and also you are to get this done as soon as possible so your husband Luggage will be ready for delivery to you at your
doorstep thank you.


Bank Name: TD Bank

Acct Names: Atllas International

Acct Number: 4339360698

Thank you,
James Renolds
UN Diplomat

### *Request: $19,850 to obtain a vacation document*

Military Base <basemilitary716@gmail.com>
to me

Good Day Mrs Darren,

    How are you doing today and hope you are having a great weekend,Please we have to let you know the reason why you are m̶
Afghanistan to sign on behalf of your husband vacation document so i think some one have to stand for you in doing that before
will leave the camp and be with you,Please Mrs you have to make the payment to same account you use in sending the balance
payment of $19.850USD and please you still have to let us know how long you want your husband to be with you before coming
who stand as is wife,So madam we are looking forward in reading from you and let us know when you are making the transfer so
have to send us your working ID card so we can know you more and make sure we know where Mr Christian Darren is going to l̶

Do have a nice day Mrs Darren,

### *Request: $21,850 Medical Bills for Darren*

Military Base <basemilitary716@gmail.com>
to me

Hello Mrs Maria,
    We are sorry for letting you know about his medical bills,But we have to let you know since you are the person who's applying f̶
husband,And we find out from the hospital which we were told is going to cast $21.850, because we where told by the hospital d̶
which cast a lot of money so we have to make that payment before having his vacation,So we will be looking forward in reading l̶
a nice day and stay blessed Madam,

Thanks And Best Regards
Military Exit Department


93.     In the short span of time from April 2017 to July 2018, Plaintiff and the Co-

Conspirators stole hundreds of thousands of dollars of Defendants money and sent it to Africa

for all matter of things associated with Christian Darren, including, but not limited to:

- Permission for Vacation $19,850
- Vacation Certificate - $28,550
- Fee for vacation processing $7500
- Medical Bills $21,850
- More medical bills $9,315
- Request to release luggage $11,200
- To release Mr. Darren from his hostages $150,000
- Legal fees to defend Mr. Darren $30,000

94.     All told and by Plaintiff's own account from Spring 2017 to July 4, 2018 she and

her Co-Conspirators stole and transmitted, to individuals outside of the United States, no less

than $485,350.

From: maryjop621 <maryjop621@aol.com>
   To: investigationdpt <investigationdpt@usa.com>
  Cc: nugent702 <nugent702@gmail.com>
Subject: MARIA J PIZARRO- ACCT Statements - C Darren Complaint
Date: Wed, Jul 4, 2018 11:14 am
Attachments: Satement 2017 Darren Payments.xlsx (11K), M Pizarro Statement 2018.ods (15K),
          Renolds Payment Statement.ods (7K)

Good Morning; Am sending 3 accounting Statements with the amount of money that I did pay for Christian Darren , The
Total Amount paid According my records is $ 485,350 This amount doesn't include transfers fees . I try to do as much
accurately as possible, because of the short time that you give me to prepare this statements, maybe there are any
missing payments  I will checks my bank accounts statements to review any missing payment done.
Thanks so much for work in my complaint  I just hope to live with peace on mind again.

Thanks so much and have a Happy 4th of July

Maria j Pizarro

95.     A tally of the receipts from this period reveals that Plaintiff and the Co-

Conspirators transmitted at least the following amounts:

| SENDER | AMOUNT SENT |
|---|---|
| BRUNILDA J RODRIGUEZ | $20,575.00 |
| EMITON FERNANDEZ | $15,200.00 |
| JOSE E CASTRO | $4,500.00 |
| MARIA J. PIZARRO | $230,329.52 |
| NARCISO GOMEZ | $5,000.00 |
| TOMAS ANDRES PIZARRO ZEPEDA | $1,900.00 |
| ZULIMAR MEJIA | $2,000.00 |

**Internet Scam**                                                    2 –

**Investigation of Christian Darren**

96.     It is evident that at some point, Plaintiff realizes that she is being scammed by Mr.

Darren.

97.     At that point she reaches out to an entity she believes to be the FBI.

98.     In reality she simply reached a second group of hackers who convinced her to

send even more money so that they could prosecute her claims.

99.     Indeed, as detailed in the email correspondence below, Plaintiff was asked for

$77,000 to investigate the case of Mr. Darren.

-----Original Message-----
From: DEPARTMENT OF INVESTIGATION FBI <investigationdpt@usa.com>
To: maryjop621 <maryjop621@aol.com>
Sent: Wed, Jul 4, 2018 2:24 pm
Subject: APPROVAL ONGOING PROCESS


*Hello Madam Maria Pizarro*

*This is the investigation department from the US department of Justice FBI  935 Pennsylvania Avenue NW in Washington, D.C.,...*

*Your case has being under Review since the first quarter  of this year as an International Crime Case and a special Agent was assign to you Agent Walker Nugent to contact you and confirming your identifications of your complaints to this office to be assure for approval .*

*We already have every information's you sent and our spy web has being on ground monitoring the transaction and all illegal activities between you and the so called claimed Darren Christian as we have found out he stole people identity on the internet in seducing women and scandalizing their financial status to emotional depressions ..We have similar case being reported and the US house of Senate has agreed we handle issues with verification and cooperation of our complainant under CONFIDENTIAL METHOD  to ensure all investigation are carried out before prosecutions ..*

*To proceed with this investigation and to contact the ambassadors in each of our designation office located in this world this claimed Darren has use in looting you and destroying your life and carrier ..*

*The act of Senate law 10 code 456 of the state criminal code/justice department code 447/hkIUSA must be applied ...*

*A wire transfer of $77,700.00cents will be made by you to our designated justice account to access all process and this payment will be made between 72 hours to validate this case and NOTE ,,,all expenses are to be REFUNDED to you the complainant after the senate have resolved this case and all damages to be paid to you ..*

100.     Plaintiff once again complied. Stealing Defendants money and utilizing the

services of her Co-Conspirators to funnel money to her presumed saviors.

**Internet Scam 3 – Stephen Thomas**

101.    Undeterred by her negative experiences with Mr. Darren, in 2019 Plaintiff created an account on the Silver Singles website and met a person allegedly named Stephen Thomas.

102.    Like Mr. Darren before him, Mr. Thomas was the name used by an internet scammer to swindle even more money out of the Plaintiff.

103.    It is estimated that Mr. Thomas convinced Plaintiff to send him at least $60,000. All of that money came from Defendants' coffers.

**Plaintiff and Castro**

104.    Even while Plaintiff was seeking love online, it appears that she maintained both an amorous and a business relationship with Mr. Castro.

105.    Indeed, as explained earlier, whenever Plaintiff travelled or could not attend work she would leave Mr. Castro, an outside contractor, in charge of the operations at Euros.

106.    Moreover, Mr. Castro was paid money to, and did in fact participate in the scheme to, send money to individuals in Africa at Plaintiff's request.

107.    Notwithstanding the aforementioned matters, Plaintiff and the defendant maintained their own separate scheme to steal and launder Defendants' money.

108.    Indeed, commencing on about May 2018, Plaintiff would give cash to Mr. Castro and then direct him to make certain checks.

109.    The Checks were issued from the account of Productions, a company whose authority to operate legally in New York had been cancelled by the New York State Secretary of State in October of 2016.

110.    Information gathered from this period reveals that in exchange for approximately $75,000 in cash (Defendants' cash) given by Plaintiff to Mr. Castro, Productions made payments

of approximately $52,200 to Plaintiff and her designated recipients.

111.    As detailed in the chart below the Payments commenced in May 2018 and continued to the end of Euros existence in November 2019:

| DATE | SENDER | RECIPIENT NAME | AMOUNT SENT |
|---|---|---|---|
| 5/30/2018 | ELADIO CASTRO PRODUCTIONS, INC. | JOE GARDNER | $7,000.00 |
| 6/4/2018 | ELADIO CASTRO PRODUCTIONS, INC. | TONY M. IPPOLITO | $3,000.00 |
| 6/5/2018 | ELADIO CASTRO PRODUCTIONS, INC. | MUDIAGA AUTO BROKER LLC | $6,000.00 |
| 6/12/2018 | ELADIO CASTRO PRODUCTIONS, INC. | ANITA ALEXANDER | $6,000.00 |
| 6/18/2018 | ELADIO CASTRO PRODUCTIONS, INC. | ANITA ALEXANDER | $7,200.00 |
| 10/23/2019 | ELADIO CASTRO PRODUCTIONS, INC. | MARIA J. PIZARRO | $3,000.00 |
| 11/13/2019 | ELADIO CASTRO PRODUCTIONS, INC. | MARIA J. PIZARRO | $13,500.00 |
| 11/27/2019 | ELADIO CASTRO PRODUCTIONS, INC. | MARIA J. PIZARRO | $6,500.00 |
| | | | $52,200.00 |

112.    Neither Plaintiff nor Castro disclosed this scheme to the Defendants.

113.    During negotiations with Castro for his promoting services, he failed to disclose to the Defendants that he was getting kickbacks from the Plaintiff by way of this money-laundering scheme that they had devised.

**Plaintiff's Fraudulent Representations**

114.    During this same period of time that Plaintiff and the Co-Conspirators were misappropriating hundreds of thousands of dollars of Defendants money, Plaintiff continued to operate the affairs of Euros.

115.    At regular meetings with Quezada and Junior, Plaintiff would claim that the business was operating at a loss and that there was not enough money to cover the expenses.

116.    On several occasions Plaintiff convinced Quezada to inject Euros with Money from his other business ventures to cover Euros expenses.

117.    On several occasions Co-Conspirator Castro met with the Quezada and Junior and parroted Plaintiff's story that Euros was losing money.

118.    Notwithstanding Plaintiff and Mr. Castro's story the business remained popular

with patrons and was full nearly every weekend.

119.    Notwithstanding Plaintiff and Mr. Castro's concerns, they never recommended closing the business or even reducing staff.

## COUNT I
### Violation on of 18 U.S.C. § 1962(c)
*Brought by Defendants against Plaintiff and the Co-Conspirators*

120.    Defendants incorporate the allegations set forth in Paragraphs 1 – 255 above as if fully set forth herein.

121.    Defendants Euros, Quezada and Junior is each a "person" under 18 U.S.C §§ 1961(3) and 1964(c).

122.    Plaintiff and the Co-Conspirators is each a "person" under 18 U.S.C §§ 1961(3) and 1962(c).

123.    For purposes of this count, Plaintiff and the Co-Conspirators acting together constitute an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), which enterprise engaged in activities affecting interstate commerce at all times relevant to this complaint.

124.    Plaintiff and the Co-Conspirators were each associated with the enterprise and conducted or participated, directly or indirectly, in the affairs of the enterprise in relation to the Defendants through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B), § 1961(5), and 1962(c), to wit: multiple, repeated, and continuous acts of interference with interstate commerce, theft and the transmission of stolen property (i.e. money) by means of wires to out of state actors.

125.    Defendants suffered injury to their business and property within the meaning of 18 U.S.C. § 1964(c) by reason of Plaintiff and the Co-Conspirators' violation of 18 U.S.C. §

49

1962(c).

<div align="center">

**COUNT II**
**Violation on of 18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(c)**
*Brought by Defendants against Plaintiff and the Co-Conspirators*

</div>

126.     Plaintiffs incorporate the allegations set forth in Paragraphs 1 – 261 above as if fully set forth herein.

127.     Defendants Euros, Quezada and Junior is each a "person" under 18 U.S.C §§ 1961(3), and 1964(c).

128.     Plaintiff and each of the Co-Conspirators is a "person" under 18 U.S.C §§ 1961(3), 1962(c), and 1962(d).

129.     For purposes of this count, Plaintiff and the Co-Conspirators acting together constitute an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), which enterprise engaged in activities affecting interstate commerce at all times relevant to this complaint.

130.     Plaintiff and the Co-Conspirators were each associated with the enterprise and conspired within the meaning of 18 U.S.C. § 1962(d) to violated 18 U.S.C. § 1862(c), that is Plaintiff and the Co-Conspirators conspired to conduct or participate, directly or indirectly, in the affairs of the enterprise in relation to the Defendants through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B), § 1961(5), and 1962(c), to wit: multiple, repeated, and continuous acts of interference with interstate commerce, theft and the transmission of stolen property (i.e. money) by means of wires to out of state actors.

131.     Defendants suffered injury to their business and property within the meaning of 18 U.S.C. § 1964(c) by reason of Plaintiff and the Co-Conspirators' commission of the racketeering activities within the meaning of 18 U.S.C. § 1961(1) that were overt acts in

violation of 18 U.S.C. § 1962(d).

## COUNT III
### Fraud
*Brought by Defendants against Plaintiff and Castro*

132.   Plaintiffs incorporate the allegations set forth in Paragraphs 1 – 267 above as if fully set forth herein.

133.   Plaintiff and Castro did commit and collectively conspired to commit fraud against the Defendants by presenting a financial picture of Euros that was inaccurate when in fact they were stealing all of the businesses' profits for themselves.

134.   At no time did the Plaintiff and Castro inform the Defendants of the truth, namely that Euros was making money but that it was presenting losses because they were stealing hundreds of thousands of dollars from the business.

135.   Had Defendants known the truth they would have immediately terminated their relationship with Plaintiff and Castro.

136.   But for Plaintiff and Castro's conduct, Euros would have been a profitable business and Quezada would not have had to inject it with money from his other ventures.

137.   Plaintiff and Castro caused Defendants severe financial harm for which they are entitled to receive compensation.

## COUNT III
### Conversion
*Brought by Defendants against Plaintiff and the Co-Conspirators*

138.   Plaintiffs incorporate the allegations set forth in Paragraphs 1 – 273 above as if fully set forth herein.

139.   Plaintiff and the Co-Conspirators wrongfully appropriated and exercised

permanent dominion and control over the Defendants assets, including monies earned at Euros during the Relevant Time Period, to the exclusion of the Defendants.

140.    The exercise of dominion and control over Defendants' funds was without legal justification and constitutes conversion of Defendants funds.

141.    Defendants are entitled to immediate possession and control over the funds wrongfully converted by the Plaintiff and the Co-Conspirators, which total amount to be determined at trial, plus punitive damages and interest.

## COUNT IV
### Aiding and Abetting Conversion
*Brought by Defendants against the Co-Conspirators*

142.    Defendants incorporate the allegations set forth in Paragraphs 1 – 277 above as if fully set forth herein.

143.    During the Relevant Time Period the Co-Conspirators were fully aware of that Plaintiff was misappropriating money that belong to the Defendants.

144.    The Co-Conspirators were also aware that without their participation in Plaintiff's scheme, Plaintiff would have been unable to steal as much of Defendant's money as she did.

145.    As a proximate result of the Co-Conspirators' aiding and abetting the conversion alleged herein Defendants are entitled to damages, in the amount to be proven at trial, which constitutes certain and concrete financial losses caused by each of the Co-Conspirators.

## COUNT V
### Unjust enrichment
*Brought by Defendants against Plaintiff and the Co-Conspirators*

146.    Plaintiffs incorporate the allegations set forth in Paragraphs 1 – 267 above as if fully set forth herein.

147.    Plaintiff and the Co-Conspirators, by virtue of their scheme to take Defendants

money and use it for their own benefit, unjustly enriched themselves at the expense of the Defendants.

148.    Plaintiff and the Co-Conspirators retained the benefits of the aforementioned improper and illegal conduct, and the retention of those benefits was unjust because Plaintiff and the Co-Conspirators engaged in unconscionable conduct for which there is no justification.

149.    As a direct result of the aforementioned actions by the Plaintiff and the Co-Conspirators, Defendants have suffered severe financial harm.

150.    Defendants are entitled to compensatory damages in an amount to be determined at trial.

**WHEREFORE,** Defendants pray for relief and judgment against all Plaintiff and the Co-Conspirators, jointly and severally, as follows:

1.    Compensatory and consequential damages in an amount to be determined at trial as a result of the acts and omissions of the Plaintiff and the Co-Conspirators;

2.    An award of punitive damages against Plaintiff and the Co-Conspirators s in an amount to be determined at trial;

3.    As to Counts I and II, threefold the damages sustained by Defendants, including but not limited to the cost of investigations, Plaintiffs' reasonable attorneys' fees and costs of this suit;

4.    An award of Defendants' reasonable attorneys' fees and costs; and

5.    Any other and further relief as the Court deems just and proper.

Dated:  New York, New York
       January 17, 2021

By: Martin E. Restituyo, Esq.
Law Offices of Martin Restituyo, P.C.
1345 Avenue of the Americas, 33rd Floor
New York, New York 10105
(212) 729-7900
restituyo@restituyolaw.com

*Attorneys for Defendants Euros El Tina*
*Restaurant Lounge and Billiards Corp.,*
*Santiago Quezada, and Santiago Quezada,*
*Jr.*